**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MISSOURI**
**WESTERN DIVISION**

JASMYNE RAMOS-WILLIAMS, KEVIN A. REDMOND, LONDON ANGEL HILL, CODY MASSA, AARON MICAH PATTERSON, KATELYN STEWART AND DANIELLE WHITE, on behalf of themselves and all other similarly situated employees,

Plaintiffs,

v.

GL PARTNERS, INC.,
Serve: INCORP Services, Inc.
1531 E. Bradford Pkwy, Suite 200
Springfield, MO 65804

GL RESOURCES, LLC,
Serve: INCORP Services, Inc.
2847 S Ingram Mill Rd, Ste A100
Springfield, MO 65804

GRASS ROOTS DISPENSARY, LLC,
Serve: Registered Agent, John Borland
203 N 10th St
Columbia, MO 65201

GRASSROOTS OPCO MO, LLC.,
Serve: INCORP Services, Inc.
1531 E. Bradford Pkwy, Suite 200
Springfield, MO 65804

WATERFRONT HOLDINGS, LLC,
Serve: Registered Agent, Megan D. Andrews
1650 North Kings Highway, Suite 302
Cape Girardeau, MO 63701

Defendants.

## COLLECTIVE ACTION COMPLAINT

1. Plaintiffs Jasmyne Ramos-Williams, Kevin A. Redmond, London Angel Hill, Cody Massa, Aaron Micah Patterson, Katelyn Stewart, and Danielle White (collectively, "Plaintiffs" or "Named Plaintiffs"), are or were employed by Defendants GL Partners, Inc., GL Resources LLC, Grass Roots Dispensary LLC, Grassroots OpCo MO, LLC, and/or Waterfront Holdings, LLC (collectively, "GreenLight" or "GreenLight Dispensary"), and bring this action as a collective action in accordance with 29 U.S.C. § 216(b) of the Fair Labor Standards Act (FLSA), on behalf of themselves and all others similarly situated, because of GreenLight's failure to pay wages in accordance with the FLSA.

2. Plaintiffs seek a declaratory judgment under 28 U.S.C. § 2201 and compensation, damages, liquidated damages, attorneys' fees, costs, and other relief available under the FLSA, 29 U.S.C. § 201 et seq.

## JURISDICTION AND VENUE

3. Jurisdiction is conferred on this Court by 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

4. Venue lies within this district pursuant to 28 U.S.C. § 1391.

## NAMED PLAINTIFFS

5. Plaintiff Jasmyne Ramos-Williams was employed as a Budtender at a GreenLight retail location in Joplin, Missouri, from February 2023 until October 2024. During her employment, Plaintiff Ramos-Williams was paid an hourly rate of $14.00, which later increased to $16.00. She was also expressly eligible for tips in addition to her hourly pay. Her pay stubs were issued by Grass Roots Dispensary, LLC.

6. Plaintiff Kevin A. Redmond was employed as a Budtender at a GreenLight retail location in Hayti, Missouri, from January 2024 until January 2025. During his employment,

Plaintiff Redmond was paid an hourly rate of $15.00. He was also expressly eligible for tips in addition to his hourly pay. His paystubs were issued by Waterfront Holdings, LLC.

7. Plaintiff London Angel Hill was employed as a Budtender at a GreenLight retail location in Independence (Noland Road), from February 2024 until February 2025. During his employment, Plaintiff Hill was paid an hourly rate of $15.00. He was also expressly eligible for tips in addition to his hourly pay. His paystubs were issued by GL Resources, LLC.

8. Plaintiff Cody Massa has been employed as a Budtender at a GreenLight retail location in Joplin, Missouri, since March 2023. During his employment, Plaintiff Massa has been paid an hourly rate of $15.00. He was also expressly eligible for tips in addition to his hourly pay. His pay stubs were issued by Grassroots OpCo MO, LLC.

9. Plaintiff "Ravyn" Aaron Micah Patterson was employed as a Budtender at a GreenLight retail location in Independence (Noland Road), from March 2023 until May 2025. During his employment, Plaintiff Patterson was paid an hourly rate of $15.00. He was also expressly eligible for tips in addition to his hourly pay. His paystubs were issued by GL Resources, LLC.

10. Plaintiff Katelyn Stewart was employed as a Budtender at a GreenLight retail location in Independence (Noland Road), from February 2022 until May 2024. During her employment Plaintiff Stewart was paid an hourly rate of $15.00. She was also expressly eligible for tips in addition to her hourly pay. Her paystubs were issued by GL Resources, LLC.

11. Plaintiff Danielle White was employed as a Budtender at a GreenLight retail location in Independence (Noland Road), from May 2024 until March 2025. During her employment, Plaintiff White was paid an hourly rate of $15.00. She was also expressly eligible for tips in addition to her hourly pay. Her paychecks were issued by GL Resources, LLC.

12. Plaintiffs have given their written consent to be Party-Plaintiffs in this action pursuant to 29 U.S.C. § 216(b). Plaintiffs bring this action as a collective action on behalf of themselves and all others similarly situated in accordance with 29 U.S.C. § 216(b).

## NAMED DEFENDANTS

13. Defendant GL Partners, Inc. ("GL Partners") is a Nevada for-profit corporation authorized to transact business in Missouri as a foreign corporation. On information and belief, GL Partners is the principal company in charge of the various GreenLight Dispensary retail locations across Missouri. GL Partners can be served through its registered agent, INCORP Services, Inc., at 1531 E Bradford Pkwy, Suite 200, Springfield, Missouri 65804.

14. Defendant GL Resources, LLC ("GL Resources") is a Missouri limited liability company that owns and operates the GreenLight retail location in Independence, Missouri. GL Resources is a wholly owned subsidiary of GL Partners and may be served through its registered agent, INCORP Services, Inc., at 2847 S Ingram Mill Rd, Ste A100, Springfield, Missouri 65804.

15. Defendant Grass Roots Dispensary, LLC ("Grass Roots Dispensary") is a Missouri limited liability company that owns and operates the GreenLight retail location in Joplin, Missouri. On information and belief, Grass Roots Dispensary is a wholly owned subsidiary of GL Partners and may be served through its registered agent, John Borland, at 203 N 10th St, Columbia, Missouri 65201.

16. Defendant Grassroots OpCo, MO, LLC ("Grassroots OpCo") is a Missouri limited liability company that owns and operates the GreenLight retail location in Joplin, Missouri. On information and belief, Grassroots OpCo is a wholly owned subsidiary of GL Partners and, can be served through its registered agent, INCORP Services, Inc., at 1531 E Bradford Pkwy, Suite 200, Springfield, Missouri 65804.

17. Defendant Waterfront Holdings, LLC ("Waterfront Holdings") is a Missouri limited liability company that owns and operates the GreenLight retail location in Hayti, Missouri. On information and belief, Waterfront Holdings is a wholly owned subsidiary of GL Partners and may be served through its registered agent, Megan D. Andrews, at 1650 North Kings Highway, Suite 302, Cape Girardeau, Missouri 63701.

18. GL Partners, GL Resources, Grass Roots Dispensary, Grassroots OpCo, and Waterfront Holdings are collectively referred to as the "Named Defendants."

**GREENLIGHT DISPENSARY**

19. GreenLight Dispensary is a cannabis dispensary company that operates retail cannabis dispensaries across Missouri, with over 16 locations in the state—including Joplin, Independence (Noland Road), Hayti, Kansas City, Harrisonville, Ferguson, St. Louis, Rock Hill, Springfield, Branson, Cape Girardeau, Columbia, Poplar Bluff, Sikeston, Noel, and Rock Port.

20. On information and belief, in addition to GL Resources, Grass Roots Dispensary, Grassroots OpCo and Waterfront Holdings, GL Partners owns, operates, manages, and controls various other limited liability companies doing business in Missouri as GreenLight Dispensary retail locations, including but not limited to: THF Partners LLC, Dream Leaf LLC, COMO HEALTH LLC, Ozark Mountain Healing LLC, FP3-Grand, LLC, Cape Girardeau Investments, LLC, Poplar Bluff, Investments, LLC, and Sikeston Investments, LLC.

21. These entities, together with the Named Defendants, are referred to as the "GreenLight Dispensary Network," and share common ownership, management, control, administrative infrastructure, and operational policies.

22. On information and belief, John Mueller serves as President, Chairman, and sole Director of GL Partners, holds ownership interests in multiple retail locations within the

GreenLight Dispensary Network and exercises signatory authority over the entities that own and operate the retail locations within that network.

23. On information and belief, Named Defendants and the other entities within the GreenLight Dispensary Network maintain a unified administrative and corporate governance infrastructure, including a professional services company, MO Health Advisors, operated by Krystal Wright, who serves as the registered agent for GL Partners and provides corporate filing, compliance, and signatory services for entities within the network, including THF Partners LLC, FP3-Grand, LLC, and Grassroots OpCo MO; as well as unified signatory authority exercised by William Mullen, who signs corporate documents and fictitious name registrations on behalf of at least nine GreenLight Dispensary locations across multiple operating entities

24. On information and belief, GL Partners has structured its operations to maintain separate legal entities while operating as a single integrated business enterprise. This structure includes:

a. Using the unified "GreenLight Dispensary" brand name and trade dress across all Missouri locations, regardless of the nominal operating entity;

b. Maintaining uniform employee policies and practices, including mandatory tip pooling policies and tip distribution methodologies, across locations nominally operated by different legal entities;

c. Exercising centralized control over labor relations, employment decisions, compensation policies, and workplace practices through common management and administrative personnel, and utilizing common payroll systems, timekeeping systems, and human resources policies across GreenLight

Dispensary locations regardless of which specific legal entity nominally employs individual workers; and

d. Operating through a unified administrative infrastructure with common registered agents, corporate service providers, and authorized signers managing multiple operating entities.

25. Ultimately, on information and belief, the Named Defendants, along with the additional entities in the GreenLight Dispensary Network, operate as a single integrated enterprise under the common control of GL Partners, and share common management, interrelated operations, common branding and business purposes, centralized control of labor relations and employment policies, and common ownership.

26. On information and belief, GL Partners exercises operational and financial control over its subsidiary and controlled entities, including approving and implementing employment policies, setting compensation structures, mandating tip pooling policies, providing centralized management direction, and maintaining ultimate authority over business operations at GreenLight Dispensary locations throughout Missouri.

27. On information and belief, Plaintiffs' immediate employer entities named as Defendants (GL Resources, Grass Roots Dispensary, Grassroots OpCo, and Waterfront Holdings) acted at all relevant times as agents, alter egos, and/or joint employers with GL Partners and other operating entities in the GreenLight Dispensary Network. These entities exercised interrelated and integrated control over employees' terms and conditions of employment, including work schedules, job assignments, pay rates, tip policies, and employment policies.

28. Named Defendants are each an "employer" within the meaning of 29 U.S.C. § 203(d) and a "person" within the meaning of 29 U.S.C. § 203(a). At all times material to this

action, Defendants have been enterprises engaged in commerce as defined by 29 U.S.C. § 203(r)(1), with an annual dollar business volume exceeding $500,000, and have been actively conducting business in Missouri.

29. GL Partners, as discussed above, is an "employer" for each Named Plaintiff, within the meaning of 29 U.S.C. § 203(d) and a "person" within the meaning of 29 U.S.C. § 203(a), as they have orchestrated a tip-pooling scheme that affects all Missouri GreenLight Locations and deprives employees of tips owed to them under the FLSA and Missouri law.

## ORGANIZATION OF GREENLIGHT RETAIL LOCATION

30. Within the GreenLight Dispensary Network, the retail facilities are typically staffed by four classifications of employees: Budtenders (i.e., sales associates), Shift Leads (also called Budtender Managers or Supervisors), Inventory Staff, and a General Manager. In each store, there are typically multiple Budtenders and Inventory Staff. There is typically a small number of Shift Leads and one General Manager.

31. Budtenders work on the sales floor and at the cash register, assisting customers in the selection and purchasing of cannabis products.

32. Shift Leads, who are sometimes referred to as Supervisors or Budtender Managers, supervise Budtenders, handle customer complaints, account for all the money in the registers, and manage access to the vault where money and products are kept, and open and close the stores. Shift Leads are also responsible for collecting and pooling the cash tips from the tip jars at the cash registers throughout the shift.

33. As Budtenders, the Named Plaintiffs were paid by the hour, and they were expressly permitted to and did participate in the tip pool that each location maintained.

34. It is common in the industry for cannabis dispensary customers to leave tips, and consistent with that custom, Named Plaintiffs frequently witnessed customers at Missouri GreenLight Dispensary stores leaving tips.

35. At the various retail locations within the GreenLight Dispensary Network, each facility has various registers that each have a tip jar where customers can leave cash tips. It is common practice at some Missouri GreenLight Dispensary stores for each Budtender to have a personalized tip jar labeled with their name.

36. Pursuant to company-wide policy and practice, Defendants used a mandatory tip pool system to distribute tips. Tips distributed from the tip pool were paid to employees daily or biweekly as part of their regular pay.

37. Pursuant to company-wide policy and practice, tips were pooled and divided among Budtenders, Shift Leads, and Inventory Staff, and in some instances, designated Managers/Supervisors.

**HAYTI LOCATION - REDMOND**

38. For example, at the GreenLight location in Hayti, Missouri, Shift Leads participated in the tip pool despite doing little to no traditional budtending work.

39. Plaintiff Redmond observed the Shift Leads functioning and acting more as managers or supervisors of the Budtenders rather than actual Budtenders. They did little to no budtending work.

40. Instead, they were tasked with opening and/or closing the store and were in charge during their given shift, as they were the first point of contact for both Budtenders and inventory staff if they had issues.

41. Plaintiff Redmond often would go through his entire shift without seeing his Shift Leads on the sales floor.

42. Instead, Shift Leads spend most of their time either working with the inventory department or in the back office.

43. In the back office, Shift Leads would monitor the security cameras and count the daily tips in the tip pool, as well as the cash at each register at the end of the shift.

44. Plaintiff Redmond also saw Shift Leads in the back office playing on their phone while the store was busy.

45. Given that the General and Assistant Manager were rarely in the store past 4 p.m., Plaintiff Redmond routinely observed and considered Shift Leads to be the acting managers during his shifts.

**INDEPENDENCE LOCATION – HILL, PATTERSON, STEWART, WHITE**

46. At the GreenLight location in Independence (Noland Road), Missouri, tips were distributed to Budtenders, Shift Leads, inventory staff, and the assistant manager.

47. Plaintiffs Patterson, Stewart, Hill, and White observed the Shift Leads functioning and acting more as managers or supervisors of the Budtenders rather than actual Budtenders. They did little to no budtending work.

48. Plaintiff Hill reports that Shift Leads would rarely tend to customers, only ever doing so if there were too many Budtenders on break and the store became busy.

49. Plaintiff Stewart similarly reports that Shift Leads were only ever tasked with budtending when the store became busy.

50. Plaintiff Patterson reports that, when he began his employment, Shift Leads would only tend to customers when too many Budtenders were on break and the store became busy. As his employment continued, Shift Leads did even less budtending.

51. Plaintiff White reports that Shift Leads "never" did any budtending.

52. Instead, Plaintiffs Patterson, Stewart, Hill, and White report that the Shift Leads were tasked with being in charge during their given shift, as they were the first point of contact for both Budtenders and inventory employees if they had issues.

53. In fact, Budtenders routinely only ever saw Shift Leads on the sales floor, where all budtending work occurs, when a customer had a complaint or in order to adjust the price of a product in their point-of-sale system, a privilege only given to Shift Leads, not Budtenders.

54. Instead, Shift Leads spent most of their time either working with the inventory department at the back of the store or in the front office.

55. In the office, Shift Leads would monitor the security cameras and count the daily tips in the tip pool.

56. Also posted in the office, the cell phone numbers were listed for the General Manager, Assistant Manager, and Shift Leads as "Important Contacts," highlighting their role above Budtenders.

57. Plaintiffs Patterson, Hill, and Stewart report that Shift Leads were also given disciplinary authority, often writing up employees and sending them home if they deemed it necessary.

58. At this location, Plaintiffs Patterson, Hill, and White report being aware that management diverted a portion of daily tips into "petty cash," which was used for monthly events such as booths at conventions. Plaintiff Patterson also reported tips being withheld for other reasons, such as to balance cash registers at the end of the day and for employee discipline.

59. Additionally, Plaintiff Hill and White witnessed the General Manager, Brandy Goodrich, and the Assistant Manager, Trey Dudley, take cash from the tip jars for gas money or snacks.

60. Indeed, the inclusion of leads in the tip pool was a persistent point of complaint among Budtenders at the Noland Road store because Shift Leads rarely performed Budtender work. Some Shift Leads were salaried employees, and others were hourly.

61. Upon information and belief, Defendants tracked tips on an Excel sheet and distributed them using a methodology that included hours worked as a factor.

62. Plaintiff White observed that the Assistant General Manager and/or General Manager track tip totals and distributions in a notebook, calculated each employee's share, and required employees to initial next to their names to confirm receipt, through which Plaintiff White learned that management personnel, including the Assistant General Manager and General Manager, were receiving tips.

63. During her time with GreenLight, Plaintiff White was instructed that if a cash drawer was short during a sale and a lead was not available to provide change, which happened often, Budtenders were to take cash from the tip drawer and use it to make change for customers. Plaintiff White complained about this practice because of how often it occurred and its impact on employee tips, but the practice continued.

**JOPLIN LOCATION – RAMOS-WILLIAMS AND MASSA**

64. At the Joplin store, when Ramos-Williams started, Defendants pooled tips and divided them among Budtenders, Shift Leads, inventory staff, and the Assistant Manager. The distribution of tips was informal and inconsistent, including instances where tips "ran out" and some employees were told they would not receive tips.

65. Since Massa's employment began, Defendants have implemented multiple tip distribution policies at the Joplin store. Initially, tips were distributed individually to Budtenders, with 10% given to management and inventory staff. Approximately six months before the time of this action, Defendants switched to a pooled tip system.

66. Under the current pooled tip system, tips are distributed daily to Budtenders, Shift Leads, and inventory staff based on hours worked on the particular day. Massa has observed, however, that while the Assistant Manager and General Manager do not "officially" receive tips, upon information and belief, they skim tips from the pool before distribution to other employees.

67. At the Joplin store, Shift Leads primarily perform manager-like work. They are tasked with opening and/or closing the store and are in charge during their given shift, as they are the first point of contact for both Budtenders and inventory staff if they have issues.

68. In fact, Plaintiff Ramos-Williams routinely only ever saw Shift Leads on the sales floor once or twice per shift.

69. Typically, Shift Leads do not perform budtending duties.

70. Instead, Shift Leads spend most of their time either working with the inventory department or in the back office.

71. In the back office, Shift Leads monitor the security cameras and count the daily tips in the tip pool, as well as the cash at each register at the end of the shift.

72. If there is a discrepancy between what the point-of-sale system said should be in the cash register and what the Shift Lead counted, the Shift Leads use tips from the tip pool to cover said discrepancy.

73. Shift Leads are also given disciplinary authority, as they are tasked with providing Budtenders with "coaching," writing up employees, and sending them home if they deem it necessary. Shift Leads are also routinely be involved in employee termination meetings.

74. At the Joplin location, Defendants distribute tips based on hours worked, not budtending duties performed. Tips collected on a given workday are divided proportionally among all employees in the tip pool based on each employee's hours worked that same day. Each employee receives an allocation calculated as follows: the total tips collected that day multiplied by that employee's hours worked, divided by the total hours worked by all employees in the pool that day. This allocation is then distributed to employees over the following days.

75. Each workday at the Joplin location, management manually calculates daily tip distributions by hand, recording total tips, hours worked, and allocated shares in handwritten daily records. Upon information and belief, Defendants maintain no electronic spreadsheets or other formal documentation of these calculations.

76. Tips earned on a given workday are not distributed until the following workday. These handwritten daily records are maintained at the Joplin location within Defendants' exclusive custody and control.

77. This methodology impermissibly includes Shift Leads and other supervisory employees in tip pools with Budtenders.

78. Despite this practice, Defendants tell Shift Leads they do not receive tips because they are not Budtenders. In reality, these employees subsequently collect their allocated tips from their personal lockers after daily distribution. Plaintiff Massa has repeatedly observed Shift Leads deny receiving tips, then retrieve tips directly from their lockers.

79. This deliberate concealment demonstrates Defendants' knowledge that the tip-pooling practice violates federal law. The secretive, "hush hush" nature of the distributions further evidences Defendants' willfulness in maintaining this unlawful scheme, despite Budtenders and other employees who regularly observe and discuss Shift Leads and supervisors collecting tips despite management's denials.

## COLLECTIVE ACTION ALLEGATIONS

80. Plaintiffs bring Count I, the FLSA claim, as an opt-in collective action pursuant to 29 U.S.C. § 216(b) on behalf of themselves and all other current and former Budtenders similarly situated who were employed by Defendants at GreenLight Dispensary stores in Missouri and were subject to Defendants' mandatory tip pool and/or other tip-diversion practices.

81. The proposed FLSA collective is defined as follows ("FLSA Collective"):

> All individuals employed by Defendants as Budtenders at GreenLight Dispensary stores in Missouri at any time within the three (3) years preceding the filing of this action through final judgment, who participated in a mandatory tip pool in which a manager, supervisor, or Shift Lead also participated.

82. The number of individuals in the collective is so numerous that joinder of all members is impracticable. Upon information and belief, the collective consists of likely hundreds of members. The exact number of members is currently unknown, but can be readily determined from Defendants' payroll, timekeeping, scheduling, tip, and personnel records.

83. Common questions of law and fact predominate over any questions affecting only individual collective members. Common questions include, without limitation:

(a) Whether Defendants maintained uniform policies and practices regarding tip pooling and tip distribution at GreenLight Dispensary stores in Missouri;

(b) Whether Defendants required Budtenders to share tips with Shift Leads and other supervisors/managers;

(c) Whether Defendants diverted tips for "petty cash," cash-drawer shortages, or other operational purposes;

(d) The appropriate measure of damages, restitution, statutory liquidated damages, and other relief.

84. Plaintiffs' claims are typical of the claims of the collective because Plaintiffs were subject to the same or similar policies and practices and were harmed in the same manner as the other Budtenders in the collective, through Defendants' tip-diversion and mandatory tip-pool practices.

85. Plaintiffs will fairly and adequately protect the interests of the collective. Plaintiffs' interests are aligned with the collective, and Plaintiffs have retained competent counsel experienced in wage-and-hour and class/collective action litigation.

86. Collective treatment is superior to other methods for fairly and efficiently adjudicating the controversy because the damage suffered by individual members may be relatively modest compared to the burden and expense of individual litigation, and because individual adjudications will avoid inconsistent results and promote judicial efficiency.

87. Plaintiffs and the collective members are entitled to court-supervised notice of this action and the opportunity to join pursuant to 29 U.S.C. § 216(b).

## COUNT ONE – VIOLATION OF THE FAIR LABOR STANDARDS ACT

88. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

89. At all times material herein, Plaintiffs and similarly situated Budtenders have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 201, et seq.

90. Under the FLSA, an "employer may not keep tips received by its employees for any purposes, including allowing supervisors to keep any portion of employees' tips." 29 U.S.C. § 203(m)(2)(B); 29 C.F.R. § 531.50.

91. Defendants' mandatory tip pool included not only Budtenders, but also Shift Leads and Supervisors in violation of 29 U.S.C. § 203(m)(2)(B).

92. Defendants maintained a mandatory tip pool that unlawfully required Budtenders to share tips with Shift Leads and other supervisors, as well as with employees who did not customarily and regularly receive tips, resulting in Plaintiffs and those similarly situated not being paid the full amount of tips owed to them pursuant to the FLSA.

93. Defendants' violations of the FLSA as alleged herein have been done in a willful and bad-faith manner.

94. As a result of the aforesaid willful violations of the FLSA, compensation has been unlawfully withheld by Defendants from Plaintiffs and similarly situated persons for which Defendants are liable pursuant to 29 U.S.C. § 216(b), together with an additional equal amount as liquidated damages, as well as reasonable attorneys' fees and the costs of this action.

95. The employment and work records for Plaintiffs and similarly situated employees are in the exclusive possession, custody, and control of Defendants, and Plaintiffs are unable to state at this time the exact amount owing to them and to those similarly situated. Defendants are under a duty imposed by 29 U.S.C. § 211(c) and the regulations of the U.S. Department of Labor to maintain and preserve Plaintiffs' and similarly situated persons' payroll and other employment records from which the amounts of Defendants' liability can be ascertained.

WHEREFORE, Plaintiffs pray that this Court grant relief against the Defendants as follows:

a. Enter a declaratory judgment declaring that Defendants have willfully and wrongfully violated Plaintiffs' statutory and legal obligations and deprived Plaintiffs and all others who are similarly situated of their rights, privileges, protections, compensation, benefits, and entitlements under the law, as alleged herein;

b. Order a complete and accurate accounting of all the compensation to which Plaintiffs, all others who are similarly situated, are entitled and the collective members are entitled;

c. Award Plaintiffs, and all others who are similarly situated, monetary damages under the FLSA in the form of back pay compensation and benefits; unpaid entitlements; and liquidated damages equal to their unpaid compensation;

d. Award Plaintiffs, all those similarly situated, and all collective Members, their reasonable attorneys' fees to be paid by Defendants, and the costs and disbursements of this action; and

e. Grant such other legal and equitable relief as may be just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial in this action.

## DESIGNATION OF PLACE OF TRIAL

Plaintiffs hereby request that the trial be held in Kansas City, Missouri.

## CIVIL COVER SHEET

Attached as **Exhibit A** is a copy of the Civil Cover Sheet.

Respectfully submitted,

**HKM EMPLOYMENT ATTORNEYS LLP**

*<u>/s/ John Ziegelmeyer III</u>*
John J. Ziegelmeyer III, MO 59042
jziegelmeyer@hkm.com
Brad K. Thoenen, MO 59778
bthoenen@hkm.com
Ethan A. Crockett, MO 74921
ecrockett@hkm.com
1600 Genessee, Suite 754
Kansas City, Missouri 64102
816.875.3332

***ATTORNEYS FOR PLAINTIFFS***